**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| John F. Johnson, et al., | ) | **CASE NO. 1:09 CV 1976** |
| | ) | |
| Plaintiffs, | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| vs. | ) | |
| | ) | |
| Fifth Third Bank, et al., | ) | <u>**Memorandum of Opinion and Order**</u> |
| | ) | |
| Defendants. | ) | |

<u>**Introduction**</u>

This matter is before the Court upon defendants' Motion for Summary Judgment (Doc. 24).  This case arises out of a residential construction mortgage loan agreement entered into between the parties. For the following reasons, the motion is GRANTED.

<u>**Facts**</u>

Plaintiffs, John F. Johnson and Ella S. Johnson, filed this Complaint against defendants, Fifth Third Bank, Fifth Third Bancorp, and Fifth Third Mortgage Company

1

(collectively, defendants[1]).

In the fall of 2004, plaintiffs applied to defendants for a construction loan to remodel their Bay Village home.  Plaintiffs' contractor, J.Q. Adams Company (hereafter, the Contractor), began work on the plaintiffs' project around October 2004. (J. Johnson depo. 96) On January 7, 2005, plaintiffs closed on the $330,000 construction loan. David Whalen was defendants' loan originator on plaintiffs' loan. At that time, plaintiffs executed, among other papers, a Construction Loan Agreement and a Construction Loan Disbursement Procedure document.  (J. Johnson depo. Ex. Q, Z)  As a part of the closing, plaintiffs also executed a HUD-1 settlement statement.  (J. Johnson depo. 73-74, Exs. N, R) This statement instructed defendants to make a $44,000 disbursement to the Contractor, as a part of the closing. (*Id.* Exs. N, R) Mr. Johnson testified:

> Q. Okay. If you turn to the second page [of the HUD-1 settlement statement], sir. Under Line 811, do you see that?
>
> A. Yes.
>
> Q. And this is -- notes payment first draw to JQ Adams. Do you see that, sir?
>
> A. Yes.
>
> Q. Okay. And the amount of that draw is for $44,000?
>
> A. Uh-huh.
>
> Q. Is that a yes, sir?
>
> A. Yes.

---

[1]     Defendants state that Fifth Third Bancorp and Fifth Third Mortgage Company played no role in the underlying transaction and that plaintiffs' counsel has agreed to dismiss them as improper parties.  As plaintiffs have not done so at this point, the Court refers to the three named Fifth Third entities as the defendants.

2

Q. Okay. And that corresponds, would you agree with me, sir, with Defendants' Exhibit K, which is the January 3rd, 2005 draw from Mr. Adams?

A. Yes.

Q. Okay. Does this refresh your recollection as to whether you were aware in – by January 7th, 2005, that there was a first draw request submitted by Mr. Adams in the amount of $44,000?

A. No.

Q. Okay. It still comes as a surprise to you that there was a $44,000 draw that was going to be paid as a part of the closing?

A. Yes.

Q. Okay. I take it you had the opportunity to review Defendants' Exhibit N before the execution, sir.

A. Yes.

Q. Okay. And it's noted clearly on Line 811 that there was going to be a payment to JQ Adams in the amount of $44,000 as part of the closing; is that fair?

A. That's fair.

Q. Okay. Did you object to the $44,000 draw request at the closing or prior to it?

A. You know, I wasn't -- I guess I missed this because -- and the contractor was calling me, complaining that the bank wasn't paying him. So, you know, he was saying that I needed to get -- tell the bank to pay him, so...

Q. You would agree with me, by signing this document, that you're agreeing that the bank should pay the $44,000 draw application, correct?

A. It looks that way, yes.

(J. Johnson depo. 75-76)

At the time of closing, plaintiffs additionally signed an Irrevocable Release which

stated in part:

(2) The Bank is not an agent for the Borrower with respect to disbursements of the

loan for the construction of the Improvements to the Property...  The Bank's purpose in making disbursements is to protect the validity and priority of its mortgage and the value of its security under the mortgage. The Bank does NOT intend to be and is NOT and WILL NOT be responsible for (i) the completion of any improvements ... upon the Property..., or (ii) the Borrower's relations with any contractors...

(3) To carry out the intent and purpose of the Residential Construction Loan Agreement,  the Borrower agrees to protect, release, acquit, hold harmless... the Bank ... against any ... liabilities ... which may arise... in connection with the Bank's disbursement(s) of the loan for the construction of the improvements...  The Borrower furthermore agrees not to sue the Bank with respect to the Bank's obligations under the Note, Mortgage, Residential Construction Loan Agreement or any other loan documents executed at the closing of this loan (collectively the "Loan Documents").

(*Id.* Ex. U)

Defendants thereafter made loan disbursements. The Construction Loan Disbursement

Procedure states in part:

**Construction Disbursement and Affidavits of General Contractor.**  Generally, the Bank will pay all proceeds by check to the General Contractor upon presentation of a construction disbursement order signed by the Owner and Contractor and accompanied by a[n] affidavit from the General Contractor as provided in Section 1311.011(B)(4) of the Ohio Revised Code.  The affidavit must state that the General Contractor has paid in full for all labor and work performed and for all materials furnished prior to the payment period, except such unpaid claims as the General Contractor specifically sets forth and identifies both by claimant and by amount claimed.  The affidavit must further indicate that no claims exist other than those claims set forth and identified in the affidavit.  The Contractor shall sign the affidavit and have his signature notarized by a notary public.

...

**Inspections and Percentages of Completion.**  The amount that will be paid on any construction disbursement order is limited by the percentage of completion of the building...

(*Id.* Ex. Z) Construction Disbursement Order forms were provided by defendants.  (*Id.* Ex. Y)

Nine such forms were completed between February 2005 and June 2005.  (*Id.*)

4

Disbursements were made after defendants received these requests for payment signed by plaintiffs and the General Contractor. (*Id.*)  For each disbursement, plaintiffs instructed defendants to pay the "max amount" of the loan available based upon the percentage of completion.  (*Id.*; J. Johnson depo. 120-121) Mr. Johnson testified that he understood that the precise dollar amount of the draws would be filled in after plaintiffs had signed those documents and the percentage of completion had been determined.  (*Id.*)  Plaintiffs would then see the specific amount of the draw on their bank statements issued by defendants the following month. (*Id.* 121-122)

Almost daily, plaintiffs visited the construction project and inspected the workmanship of the project as well as the percentage of the completion of the project.  (*Id.* 123-124) Prior to June 2005, plaintiffs did not object to defendants' payment of the Contractor because they "figured it was going the way it should."  (*Id.* 125)

On June 17 or 18, 2005, as previously done, plaintiffs instructed defendants to pay the maximum amount of the loan available based upon the percentage completed. (*Id.* 167-168; Ex. Y) But, plaintiffs considered there to be "lots of problems" on the project and were "really upset." Mrs. Johnson tried to telephone defendants "to say, you know, please don't pay– please don't pay a lot because, you know, this is not going the way that we had hoped..." Plaintiffs were unable to speak with defendants that day, a Friday.  (*Id.* 168)  Mrs. Johnson was unable to speak with defendants until the next business day which was a Monday, June 21, 2005.  By that time the disbursement of $25,130 had been made.  (*Id.* 171-172)

The Contractor never completed the construction project and eventually "walked off

5

the job." (*Id.* 201-202)[2]

Plaintiffs filed this Complaint on August 24, 2009, setting forth six claims.  Count One alleges breach of contract based on the alleged improper disbursements of January 7, 2005 ($44,000) and June 17, 2005 ($25,130).  Count Two alleges a violation of Ohio Revised Code § 1311.011 given that the two disbursements were fraudulent.  Count Three alleges a breach of fiduciary duty.  Count Four alleges that the disbursement of funds was grossly negligent in violation of Ohio Revised Code § 1311.011.  Count Five alleges a violation of the Truth in Lending Act (TILA).  Count Six alleges a violation of the Financial Privacy Rule.

This matter is now before the Court upon defendants' Motion for Summary Judgment.

**Standard of Review**

Summary Judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

---

[2]     Plaintiffs sought arbitration against the Contractor and eventually settled for $100,000.  (John Johnson depo. 220-221)  Plaintiffs also received $88,000 in insurance proceeds.  (Ella Johnson depo. 271-272)

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).  A fact is "material only if its resolution will affect the outcome of the lawsuit."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party.  Federal Rule of Civil Procedure 56(e) provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of [his] pleadings, but [his response], by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is genuine issue for trial.  If he does not respond, summary judgment, if appropriate, shall be entered against him.

The court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party.  *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (citation omitted); *see also United States v. Hodges X-Ray, Inc.,* 759 F.2d 557, 562 (6th Cir. 1985).  However, the nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury."  *Cox*, 53 F.3d at 150.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Accordingly, "the mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 52 (1986)).  Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the

legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citation omitted).

**Discussion**

**(1) Release**

Defendants argue that by executing the Irrevocable Release, set forth in relevant part above, plaintiffs released defendants from liability for all of the claims asserted in the Complaint. Specifically, defendants contend that because all of plaintiffs' claims arise out of defendants' actions in disbursing the loan, plaintiffs have released the claims.

Plaintiffs assert several arguments in support of their contention that the release does not apply to bar their claims. For the following reasons, plaintiffs' reasons are not persuasive.

Plaintiffs' assertion that the release lacks the formalities of a contract because there is no signature by defendants is not a basis to avoid the release in the absence of any authority cited by plaintiffs, due to the fact that it was signed by both plaintiffs who are the parties against whom enforcement is sought. Next, plaintiffs point out that their signatures are not notarized. As recognized by defendants, however, Ohio law does not require that contracts be notarized.

Plaintiffs also assert that because the release agreement is between Fifth Third Bank of Northeastern Ohio and plaintiffs and not Fifth Third Mortgage Company who is identified as the lender in the Construction Loan Agreement, it is specific to the former and not the latter. Defendants, however, present affidavit testimony that Fifth Third Bank of Northeastern Ohio is merely a registered trade name of Fifth Third Bank, and is not an independent, corporate entity. (Doc. 29 Ex. A)

Last, plaintiffs point to the language of the release which states, "To carry out the

intent and purpose of the Residential Construction Loan Agreement, the Borrower agrees to protect, release...” Plaintiffs assert that this releases defendants from actions in carrying out the intent and purpose of the loan documents but not in *failing to carry out* their intent and purpose as was done here.  Plaintiffs, however, do not point to any support or legal authority stating that failure to carry out the intent invalidates the release.

For these reasons, plaintiffs are unable to show that the release is unenforceable.  As plaintiffs’ claims arise out of defendants’ actions in disbursing the loan, plaintiffs have released the claims and summary judgment to defendants is warranted.

Assuming the release is not valid, the Court addresses the claims on their merits.

**(2) Breach of contract**

Count One alleges that defendants breached the Construction Loan Agreement and the Construction Loan Disbursement Procedure agreement by improperly disbursing the $44,000 on January 7, 2005, and the $25,130 on June 17, 2005.

Under Ohio law,“The essential elements of a cause of action for breach of contract are the existence of a contract, performance by the plaintiff, breach by the defendant and resulting damage to the plaintiff.”  *JLJ Inc. v. Rankin & Houser, Inc.,* 2010 WL 329179 (Ohio App. 2d Dist. Aug. 20, 2010) (citing *Winner Brothers, L.L.C. v. Seitz Elec., Inc*., 182 Ohio App.3d 388 (2d Dist. 2009).

Defendants argue that plaintiffs cannot show a breach by defendants or that the alleged breach caused any damages.           For the following reasons, this Court agrees.

**(a) the $44,000 disbursement**

Plaintiffs contend that contrary to the Construction Loan Disbursement Procedure

9

agreement, defendants did not obtain a notarized affidavit from the Contractor or make an

inspection prior to the distribution.  Rather, plaintiffs assert, defendants made the distribution

based on a handwritten note from the Contractor which was not disclosed to the plaintiffs.

Plaintiffs, however, authorized the payment.  Line 811 of the HUD-1 settlement

statements states, "Payment 1st Draw to JQ Adams Construction Inc.- $44,000.00" (J. Johnson

depo. Ex. R) Both plaintiffs signed the statement, thereby certifying that "I have carefully

reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a

true and accurate statement of all receipts and disbursements made on my account or by me in

this transaction."  (*Id.*) Furthermore, Mr. Johnson testified[3],

> Q. You would agree with me, by signing this document [the HUD-1 Settlement
> Statement], that you're agreeing that the bank should pay the $44,000 draw
> application, correct?
>
> A. It looks that way, yes.

(J. Johnson depo. 75-76) Mrs. Johnson testified,

> Q.  Okay.  But you would agree with me that you're authorizing the bank in
> Defendants' Exhibit N and R [the HUD-1 Settlement Statement] to make the $44,000
> payment?
>
> A. We were interested in --
>
> Q. Yes or no? Yes or no, ma'am. Yes or no?
>
> A. We signed to authorize the bank to do the right thing, and we thought the 44,000
> was the right thing.

---

[3]   The Court relies on plaintiffs' deposition testimony.  In responding to the Motion
for Summary Judgment, plaintiffs submitted their affidavits which were created
well after their depositions were taken.  While defendants do not ask the Court to
strike the affidavits, defendants point out that the affidavits improperly contradict,
in part, the plaintiffs' prior deposition testimony.

10

Q. Okay. I'll ask the question one more time. And it's a yes-or-no question, ma'am. Did you authorize the bank to make the $44,000 payment by executing Defendants' Exhibit N and/or Defendants' Exhibit R?

A. Yes, we did.

(Ella Johnson depo. 157-158) Because the evidence shows that plaintiffs authorized the first distribution, there was no breach.  *See Charter One Bank v. Hamburger*, 2002 WL 252382 (Ohio App. 6th Dist. Feb. 22, 2002) (Where plaintiff approved the draws, she cannot assert that the bank should have withheld some of the funds until defects in the construction of the home were corrected.)

### (b) the $25,130 disbursement

Defendants assert that this disbursement was made pursuant to the Construction Loan Disbursement Procedure and Construction Loan Agreement which required defendants to make disbursements after receiving a signed construction disbursement order form and contractor's affidavit.  As with the other disbursement orders, plaintiffs had instructed defendants to disburse the "max amount," and a notarized general contractor's affidavit was submitted.  (J. Johnson depo. Ex. Y) Once plaintiffs authorized the "max amount," they understood that defendants were paying the Contractor "based on what [defendants] felt he should be paid."  (*Id.* 121) Upon receiving the signed disbursement order and the affidavit, defendants made the disbursement based on the percentage of completion.

Plaintiffs contend that defendants accepted the Contractor's request for payment for the maximum amount although the Contractor did not state what work he had completed, and defendants changed the disbursement amount of $4,189 which had been approved on June 14 to $25,130 without getting another inspection report and notifying plaintiffs. Plaintiffs assert

11

that after the June 17 distribution, 92.5% of the construction loan had been distributed, and

the disbursements did not accurately reflect the true percentage of completion.  Plaintiffs state

that their expert, George Poulos, has opined that the project was only 50% to 60% complete

as of the end of June 2005, and the disbursements should have been approved in that range

instead.

Again, however, the evidence shows that plaintiffs authorized the disbursement.  Both

plaintiffs executed the payment voucher on the Construction Disbursement Order form. (J.

Johnson depo. Ex. Y)  Mr. Johnson testified,

> Q. Okay. And this [construction disbursement order] is dated June 17th, 2005. Do you
> see that, sir?
>
> A. Yes.
>
> Q. And that is your and your wife's signature on the bottom?
>
> A. Yes.
>
> Q. And was this construction disbursement order executed in the same way the
> previous ones were, where 'maximum' was written in?
>
> A. Uh-huh. Yes.
>
> Q. Okay.. And then subsequent, someone wrote in "$25,130 at 90.5 percent"?
>
> A. That's correct.
>
> Q. And can you -- do you have any recollection of how this disbursement order came
> to be executed, sir?
>
> A. At this point, it was -- there were lots of problems. This is the one where he came
> to us and said he just wanted to pay some of the subs that had been on the job. And I
> wanted to make sure that people were paid, and so I said okay. And so we signed this
> form, but we said, We're really upset with everything else. And he, you know, did
> what he always did. He disappeared with the stuff.
> And then -- but at that point my wife started calling Dave Whalen to say, you know,
> please don't pay -- please don't pay a lot because, you know, this is not going the way

that we had hoped, and this is not still working out. So...

(J. Johnson depo. 167-168) The Construction Disbursement Order shows that defendants were

authorized to pay the "max" amount, and the Contractor's notarized affidavit was submitted.

(*Id.* Ex. Y)   Mr. Johnson testified that by executing the order, plaintiffs were authorizing

defendants to pay the maximum amount.  (J. Johnson depo. 170)   He further testified:

> Q.  Okay.  Why would you sign this, if you were just going to call Fifth Third and tell them to ignore it?
>
> A. We were trying to get back – as I mentioned, back into the house, trying to work with [the Contractor], trying to, you know – and that was a cause of concern between my wife and I. [Ms. Johnson] didn't want to sign it. I said, Just sign it. Let's work with him. Let's get it done. Let's try to get back – you know, back in the house. So during that time there was – so she was very upset and started calling right away.

(*Id.* 171)   Mrs. Johnson testified that although she executed the June 17 form, she attempted

to call the defendants to inform them that she was only authorizing payment for the

subcontractors. (E. Johnson depo. 130-131) She further testified:

> Q. Okay.  My question is, ma'am, if you had reservations about the project on June 17, 2004 [sic], why were you authorizing the bank to make the maximum disbursement by executing [the Construction Disbursement Order]?
>
> A.  I wasn't trying to let them execute- - let out a large amount of money.  My phone calls were my attempt to limit the amount of money just to people who I had seen with my own two eyeballs doing- - actually doing working on the project.  And that was why I made phone calls.
>
> \*\*\*
>
> Q.  Why did you not refuse to sign [the June 17 Construction Disbursement Order]?
>
>
> A.  Because we were trying to get back into our house.  And this contractor said, if we just paid the subs, he would hook up my washer and dryer and I could quit going to

13

the Laundromat to do laundry every week.

Q. And that concern to get back in the house prompted you to execute the payment voucher, despite your concerns at that point in time; is that fair?

A. No. Because I didn't just execute a document and go out for a latte. I got on the phone to the bank three times that day, two times Monday. And all weekend, Father's Day weekend was ruined not knowing what was going on. Because by 10 to 4, when I felt I'd better get back to my home now, it was summer. My kids are out of school. We had been promised we'd be in at a certain time. We weren't in. I'm wanting to get my family out of this business property where I had a two-burner hot plate to cook on and back to our home. And I was being told it was two weeks. Two weeks. Two weeks. And so my concern was, no, I didn't I just blithely execute this document. I called the bank...

(*Id.* 133-136)

Thus, the evidence shows that the plaintiffs authorized the draw because they wanted to get "back into the house" despite their doubts about the Contractor.  Plaintiffs then decided that they did not want defendants to release the full amount.  Nonetheless, however, plaintiffs had approved the maximum amount[4], and defendants acted on the approval.  For this reason defendants did not breach their agreement.

For the foregoing reasons, plaintiffs have not shown a breach by defendants.[5]

---

[4]     Mrs. Johnson testified that although the form stated that plaintiffs were authorizing defendants to pay the "max" amount, she "wouldn't have the ability to say whether the max was written in at the time [she] signed it or not."  (E. Johnson depo. 137) Mr. Johnson, however, did not dispute that plaintiffs filled in the word "max" or signed the voucher with the word 'max' filled in on the amount line.

[5]     While Count One of the Complaint alleges that the contract was breached in two ways, by disbursement of the $44,000 and the $25,130, plaintiffs now present additional arguments in support of their breach of contract claim.  Plaintiffs cannot assert new bases for breach of contract at this stage in the litigation. *See Yanovich v. Zimmer Austin, Inc.,* 255 Fed. Appx. 957 (6th Cir. 2007) (citations omitted) ("A party is not entitled to wait until the discovery cutoff date has passed and a motion for summary judgment has been filed on the basis of claims asserted

14

**(c) damages**

Defendants argue that even assuming a breach is found, plaintiffs cannot establish damages given that Ohio courts have recognized that a bank's alleged improper payment to a contractor does not proximately result in the poor quality of the work he performed and, therefore, does not result in harm to the plaintiffs. *Wooten v. Republic Sav. Bank,* 172 Ohio App.3d 722 (2d Dist. 2007); *St. Henry Tile Co., Inc. v. Schleiger,* 1998 WL 28006 (Ohio App. 2d Dist. Jan. 16, 1998).

The Court need not reach the issue of damages.  Even if it did, plaintiffs' damages were incurred because of the Contractor's actions and not defendants'.

Plaintiffs assert that the money remaining in the construction loan as of June 17 was insufficient to complete the project.  Plaintiffs contend that the disbursements made to the Contractor allowed him to abandon the project and caused plaintiffs' damages to the extent that they had to pay an additional $152,885 to complete the project and also paid over $46,000 to subcontractors and suppliers who were not paid from the disbursements to the Contractor.  Additionally, as a result, the project was not completed until July 2006, which caused the conversion of the construction loan to a permanent mortgage to be delayed until July 2007, which caused plaintiffs to pay additional interest.  Plaintiffs assert that they also suffered damages by having to liquidate their IRA accounts, 401k accounts, and life insurance policies to raise money to satisfy liens, pay suppliers, and complete the project.

---

in the original complaint before introducing entirely different legal theories....")

Plaintiffs assert that they are not seeking damages for the Contractor's defective work but for damages caused by defendants' improper disbursements. But, plaintiffs have not shown that the work described in the two draws at issue was not performed. Instead, plaintiffs assert that after the June 17 draw, the Contractor abandoned the project and at that point the plaintiffs had concerns over his work. Thus, the plaintiffs incurred the costs they refer to because of the Contractor's actions and his defective work. As a result, there is no nexus between defendants' conduct and the damages.

For these reasons, summary judgment is granted as to Count One.

**(3) Ohio Revised Code § 1311.011**

Counts Two and Four allege violations of Ohio Revised Code (O.R.C.) § 1311.011 based on the fraudulent and grossly negligent disbursement of the funds. Defendants argue that these claims are time-barred. For the following reasons, this Court agrees.

It is not disputed that the statute of limitations for gross negligence and fraud is four years, and that the discovery rule is available to fraud claims. *Wooten, supra* (citing O.R.C. § 2305.09, other citations omitted) The Complaint herein was filed August 24, 2009. The two disbursements at issue occurred on January 7, 2005 and June 17, 2005. On this basis, the claim for gross negligence was filed outside the four-year limitations period. Plaintiffs appear not to dispute this conclusion in their responsive brief. Therefore, the gross negligence claim (Count Four) is time-barred, and summary judgment is proper as to that claim.

The remaining issue is whether the fraud claim is time-barred.[6] "The limitations

---

[6]     Defendants also state that plaintiffs "do not specifically identify a fraud claim in their Complaint." Presumably, this refers to the obligation to plead fraud with specificity. Because no further argument is made, however, the Court will not

period begins to run when the claimant discovered or, in the exercise of reasonable care, should have discovered the fraud."  *Wooten*, 172 Ohio App.3d at 732 (citations omitted)

Defendants assert that plaintiffs discovered the alleged fraud well before August 2005. Defendants assert that in June 2005, plaintiffs believed that there was something wrong with defendants' disbursements.  Defendants point to Mr. Johnson's deposition testimony:

> Q. Okay. So going back to my original question, sir, prior to June 2005, did you ever object to the bank's payment of the contractor, based upon a percentage of actual completion?
>
> A. No.
>
> Q. Well, why not?
>
> A. We didn't .- we figured it was going the way it should.
>
> Q. Okay. Is that what it appeared to you?
>
> A. Until toward the end, yes.
>
> Q. Until June?
>
> A. No, until May.
>
> Q. May?
>
> A. Yeah.
>
> Q. Okay. And what was it specifically about May, sir, that you became -- or strike that. What was it that happened in May that you discovered that there may have been a problem with the loan disbursements?
>
> A. A couple of things. I got a call from Dave Whalen, and he said that I've got to do something about the contractor because he's calling everybody inside the bank, even the bank president, wanting to know how much money we have. And the contractor started coming, asking for additional funds.

---

address this contention.

17

(J. Johnson depo. 125-126)   Defendants also assert that the plaintiffs first contacted defendants in June 2005, about their concerns over the payments and the Contractor. Defendants point to Mr. Johnson's testimony, discussed above, that despite authorizing the June 17 draw, plaintiffs attempted to contact defendants because they were upset about the way things were going.  Mr. Johnson further testified that on that date, plaintiffs returned to the house to find that the Contractor had removed all of his work materials.  Defendants point to Mrs. Johnson's testimony that she attempted to call defendants on June 17 to tell them that plaintiffs were only authorizing payment for the subcontractors.  (E. Johnson depo. 131) Finally, defendants point to Mr. Johnson's testimony that mechanics' liens were filed against their property as early as July 5, 2005.  (J. Johnson depo. 176-177)[7]

Plaintiffs rely exclusively on Mrs. Johnson's affidavit testimony that "I finally received our loan file in February/March 2009; however, I did not receive the wire transfer documents until January 2010 at which time I discovered documents that had been concealed from us."  (E. Johnson aff. ¶ 24)

The deposition testimony shows, however, that plaintiffs learned on the Monday following June 17, when they spoke with defendants, that the $25,130 had been paid.  (J. Johnson depo. 171-172,176).  Both plaintiffs aver that they did not approve a disbursement of $25,130.  (E. Johnson aff. ¶ 19; J. Johnson aff.¶ 27)  Thus, plaintiffs should have discovered on Monday, June 21, that defendants allegedly committed fraud in disbursing an amount

---

[7]    Defendants also assert that an attorney for plaintiffs contacted defendants in July 2005, asking questions about the project and disbursements.  Defendants, however, point to evidence that an attorney contacted the Contractor at that point. (J. Johnson depo. 183-184, Ex. DD)

18

plaintiffs did not authorize.  On this basis, the fraud claim is time-barred because it was filed more than four years later.

For these reasons, Count Two and Four are dismissed.

**(4) Fiduciary Duty**

Count Three alleges that on June 14, 2005, defendants breached their fiduciary duty to plaintiffs by changing the available construction loan funds for the Contractor from $4,189 to $25,130 without an inspection or valid affidavit from the Contractor and by disbursing the funds without plaintiffs' approval after plaintiffs had informed defendants of their problems with the Contractor.

Defendants assert that this claim fails as a matter of law.  The Court agrees for the following reasons.

The Ohio Supreme Court has recognized that "a fiduciary duty does not arise between a bank and a prospective borrower unless there are special circumstances."  *Groob v. Keybank*, 108 Ohio St.3d 348, 353 (2006).  The *Groob* court noted,

> The General Assembly codified this principle in R.C. 1109.15(D), which states, 'Unless otherwise expressly agreed in writing, the relationship between a bank and its obligor, with respect to any extension of credit, is that of a creditor and debtor, and creates no fiduciary duty or other relationship between the parties.'

*Id.*  Defendants point to the absence of any writing stating that defendants agreed to act as a fiduciary. In fact, the Irrevocable Release states, "The Bank does not intend to act in any way for or on behalf of the Borrower in disbursing the proceeds of the loan."  (J. Johnson depo. Ex. U)

Plaintiffs argue that the "special circumstances" referred to in *Groob* exist here because defendants were in a superior position during the processing and disbursement of the

19

construction loan.  But, as noted in *Groob*, the special circumstances are those referred to in the statute, i.e., an express agreement in writing.  Because plaintiffs do not point to any agreement in writing that a fiduciary duty existed, the parties' relationship was one of creditor and debtor, and no fiduciary relationship was created.

For these reasons, Count Three fails as a matter of law.

**(5) TILA**

Count Five alleges a Truth in Lending Act (TILA) violation.  Defendants argue that the claim is barred by the applicable statute of limitations.  This Court agrees.

It is not disputed that TILA has a one-year statute of limitations on statutory damages claims.15 U.S.C. § 1640(e).  Plaintiffs, however, assert that equitable tolling applies.  In such a situation, "the one year period will begin to run when the borrower discovers or had reasonable opportunity to discover the fraud involving the complained of TILA violation." *Jones v. TransOhio Sav. Ass'n*, 747 F.2d 1037, 1041 (6th Cir.1984).  Plaintiffs contend, as they did with regard to their Ohio statutory claim, that they did not discover the fraud until they obtained their complete mortgage loan file in March or April 2009.  As discussed above, this argument fails.  Furthermore, both plaintiffs signed the HUD-1 settlement statement which clearly listed the $44,000 disbursement.  Concerning the $25,130 disbursement, the testimony shows that plaintiffs learned on the Monday following the disbursement that this amount was released to the Contractor.  Additionally, as discussed above, plaintiffs testified that the amount of each draw appeared on their bank statement in the month following the disbursement.  Thus, plaintiffs would have learned, at the latest, in July or August 2005 of the latter disbursement.  Clearly, the one-year limitations period has expired.

For these reasons, the TILA claim is barred.

**(6) Financial Privacy Rule**

Defendants contend that there is no private right of action under the statute referred to in Count Six, 15 U.S.C. §§ 6801-6809.  Plaintiffs do not dispute this assertion.  The Court agrees that dismissal of this claim is appropriate.

**<u>Conclusion</u>**

For the foregoing reasons, defendants' Motion for Summary Judgment is granted.

IT IS SO ORDERED.


       /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge


Dated: 11/15/10